Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| BENJAMIN NELSON, COREY KAHALAWAI, KIRK KAMA, HAWAII FIREARMS COALITION | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ VERIFIED COMPLAINT |
| HONOLULU CITY AND COUNTY | ) ) | |
| Defendant | ) ) ) ) ) | |
| _____ | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, BENJAMIN NELSON, COREY KAHALEWAI, KIRK KAMA, and HAWAII FIREARMS COALITION, by and through their undersigned counsel, and complains of the Defendant as follows:

## I

## PARTIES

**Plaintiffs**

1.  Plaintiff Benjamim Nelson (Nelson) is a natural person, an adult male resident of the State of Hawaii and resides in Honolulu County and is a citizen of the United States. But for the actions of Honolulu County (County) challenged in this lawsuit, he would have a carry concealed weapon license or permit (CCW);

2.  Plaintiff Corey Kahalewai (Kawalewai) is a natural person, an adult male resident of the State of Hawaii and resides in Honolulu County and is a citizen of the United States. But for the actions challenged in this lawsuit, he would have a (CCW);

3. Plaintiff Kirk Kama (Kama) is a natural person, an adult male, resident of the state of Hawaii and is a citizen of the United States.  But for the actions of County challenged in this lawsuit, he would have a CCW.

4.  Plaintiff Hawaii Firearms Coalition (HIFICO) is a member

driven organization incorporated under the laws of the State of Hawaii with its principal place of business in Honolulu, Hawaii, Hawaii Firearms Coalition promotes legislative and legal action, as well as research, publishing, and advocacy, in support of people's civil liberties.  Hawaii Firearms Coalition litigates and supports firearm-regulation cases, and it has consistently advocated for a principled interpretation of the United States Constitution to prevent government from violating the basic civil rights of its citizens. Members of HIFICO have provided informed analysis in a variety of firearm related cases, including *Fisher vs. Louis Kealoha*, et al., 855 F. 3d 1067 (9th Cir. 2017), *Roberts vs. City and County of Honolulu*, Civ. No. 15-00467 ACK-RLP, and *Roberts vs. Ballard*, et al., Civ. No. 18-00125. HIFICO has over 388 members in Hawaii including many in Honolulu county as well as all the other Hawaiian counties with valid concealed carry permits (CCW). But for the actions of County challenged within this lawsuit, HIFICO members, who applied in Honolulu county, who have applied more than one-hundred-twenty (120) days ago would have their CCW.  HIFICO brings this action on behalf of those members with a pending Honolulu County CCW application who have not yet received their CCW after a period of one-hundred-twenty (120) days;

**Defendant**

3

5.  Defendant County of Honolulu ("County") is a municipal corporation incorporated under the laws of the State of Hawaii. County is authorized by law to control and maintain the Honolulu Police Department, an agency of the County, who acts on County's behalf in the area of law enforcement. County is therefore ultimately responsible for Honolulu Police Department ("HPD"), and their actions, and therefore, must assume the risks incidental to the maintenance of HPD, their employees, laws, customs and policies. County can be served by serving the Department of the Corporation Counsel, Honolulu County at 530 South King Street, Suite 110, Honolulu, Hawaii 96813;

## II

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988;

7.  Venue lies in this Court pursuant to 28 U.S.C. § 1391;

## III

## INTRODUCTION

8.  This action challenges the constitutionality of concealed carry weapon permit (CCW) issuance policies, actions, rules, and or customs of County that make it extremely difficult, if not outright impossible or impermissibly

time consuming, for Plaintiffs to obtain permits to carry a concealed firearm

in public and therefore to exercise their right to be armed in public, as

guaranteed by the Second Amendment's text "bear arms," and as recognized

and reaffirmed by the Supreme Court in *New York State Rifle & Pistol Ass'n,*

*Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

9.  The main policies, actions, and customs that Plaintiffs target and allege

are unconstitutional here are Defendant's failure to timely process carry

permit applications. These practices, rules, customs, habits and policies,

violate the Second and Fourteenth Amendments.

10.  In anticipation of bad-faith efforts to obstruct its ruling in recalcitrant

jurisdictions, the *Bruen* Court expressly invited challenges such as this one,

noting that, "**because any permitting scheme can be put toward abusive**

**ends, we do not rule out constitutional challenges to shall-issue regimes**

**where, for example,** *lengthy wait times in processing license applications*

or exorbitant fees deny ordinary citizens their right to public carry." *Id*.

(emphasis added).  The policies that Plaintiffs challenge have gone far

beyond "abus[ing]"constitutional rights. Defendants have flat-out denied

Plaintiffs their rights to be armed outside of their homes by establishing an

onerous permitting regime replete with subjective and discretionary

decisions, poll tax-like fees, and as applicable to this lawsuit, egregious wait times designed to flout the Supreme Court's precedents.

## IV

## STATEMENT OF LAW

### A

### SECOND AMENDMENT

11.  The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.";

12. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016);

13.  Firearms are protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008);

14.  The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to

ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).  The Fourteenth Amendment to the United States Constitution provides in pertinent part: No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

15. "[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135;

16.  *Heller* established a "text, history, and tradition" framework for analyzing Second Amendment questions. *See Bruen*, 142 S. Ct. at 2127-29, citing *Heller*, 554 U.S. at 634. Under that framework, the *Heller* Court assessed historical evidence to determine the prevailing understanding of the Second Amendment at the time of its ratification in 1791. Based on that assessment, the Court concluded that the District of Columbia statute which prohibited possession of the most common type of firearm in the nation (the

handgun) lacked a Revolutionary-era tradition, did not comport with the historical understanding of the scope of the right, and therefore violated the Second Amendment;

17.  In *Bruen*, the Supreme Court held unconstitutional New York's "good cause" licensing requirement because a State may not condition the right to publicly carry handguns on a citizen's "special need for self-defense." *Bruen*, 142 S.Ct. at 2135 n.8;

18.  The "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This is because the Second Amendment "presumptively protects" carrying firearms. *Id.* At 2129. To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129;

19.  It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127; *see also id.* At 2150

("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined;

20.  The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. In doing so, *Bruen* explicitly rejected New York's attempt to justify its restriction as analogous to a historical "sensitive place" regulation. 142 S.Ct. at 2133-34. The Court explained that a state may not simply ban guns wherever people may "congregate" or assemble. A rule that "expand[ed] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S.Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id;*

21.  It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. *Frost & Frost Trucking Co. v. Railroad Comm'n of California*, 271 U.S. 583, 593-94 (1926).  "Constitutional rights would be of little value if they could be . . . indirectly denied" (*Smith v. Allwright*, 321 U.S. 649, 664 (1944)), or

"manipulated out of existence." *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960). "Significantly, the Twenty- Fourth Amendment does not merely insure that the franchise shall not be 'denied' by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be 'denied or abridged' for that reason." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (citation omitted). Thus, like the Fifteenth Amendment, the Twenty-Fourth "nullifies sophisticated as well as simple-minded modes" of impairing the right guaranteed. *Lane v. Wilson*, 307 U.S. 268, 275 (1939). " 'It hits onerous procedural requirements which effectively handicap exercise of the franchise by those claiming the constitutional immunity.' " *Harman*, 380 U.S. at 540-41 (citations omitted), quoting *Lane*, at 275.

22.  *Bruen* further establishes several requirements to determine whether a historical regulation is sufficiently analogous. First, the relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135-36. That is because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S.Ct. at 2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).  "20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the

Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28;

23.  Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*.  Legislation, history and events following the Civil war can confirm but cannot limit, reduce or infringe upon the rights as understood in 1791.  In other words, only those restrictions with roots at the time of the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961));

24.  Second, the historical analogue must be "representative." Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded.  *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156.  Courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson,* 9 f.4th 217 (3rd. Cir 2021),- individual self-defense is the central component of the Second Amendment right;

25.  Third, the historical analogue must be "relevantly similar," which is to say that it must burden ordinary, law-abiding citizens right to carry in a similar manner and for similar reasons. *Bruen*, 142 S. Ct. at 2132.  *Bruen* thus held that the inquiry into whether a proper analogue exists is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era.  *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. "Thus, 'postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id*., quoting *Heller v. District of Columbia*, 670 F.3d , 670 F.3d 1224, 1274, n.6 (Kavanaugh, J., dissenting);

26.  Fourth, the historical analysis required by the Supreme Court is fundamentally a legal inquiry that examines legal history, which is appropriately presented in briefs. *See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal questions" that judges can address) (emphasis in original); *see* also id. at 2135 n.8 (rejecting the dissent's

suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court;

27.  The text of the Second Amendment, as authoritatively interpreted by the Supreme Court, indisputably covers possession (keep) and the wear, carry, and transport (bear) of firearms, including handguns by ordinary, law-abiding citizens.  The State bears the burden to demonstrate that there is an enduring, well-established, representative historical analogue to the restriction imposed by the government. And the historical analogue must be "relevantly similar" to the contemporary restriction imposed by the government, burdening the Second Amendment right in a similar manner and for similar reasons. Under this test established in *Bruen*, County cannot meet its burden to justify its delay in the issuance of CCW permits.  There is no historical analogue of <u>any</u> delay in the issuance of CCW[1];

---

[1] There is also no historical analogue allowing the government to infringe on being able to carry arms through a licensure or permitting process at all or with any delay.  It may be that certain persons are disallowed from possession or carriage of an arm, but that is vastly different than seeking permission to exercise a right at the present and in the future and to be forced to endure an invasive, onerous, expensive, subjective, time-consuming process.  This current lawsuit does not attack the general concept of a licensure system for carrying concealed, or unconcealed, but notes that Hawaii and County have made it so that open carry is all but impossible for the average person, and subject to the Chief's discretion and carrying concealed requires an applicant to proceed through onerous requirements and discretionary issuance.  If one method of carry, unconcealed, has hurdles and

## STATEMENT OF LAW

## B

### Fourteenth Amendment

28. The Due Process states that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law". *See* U.S. Const. amend. XIV, § 2;

29. Under the law governing substantive due process, Plaintiff must prove that: (1) he had a valid interest at stake; and (2) defendant infringed on that interest in an arbitrary or irrational manner. *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 545 (2d Cir. 2014);

30. Plaintiffs have a valid liberty interest in their constitutional right to carry a weapon concealed[2];

---

some governmental discretion, then the other manner, concealed, must be accomplished through merely ministerial application of objective measures such as ensuring that the applicant is not prohibited from possessing or carrying arms.  In Hawaii, to top it all off, the issuance of CCW has interminable delays.

[2] *Bruen* made clear that a state can choose to have minimal, objective requirements in order to carry in a particular mode, "shall issue", whether unconcealed or concealed, but cannot make one mode onerous and difficult to exercise and the other mode effectively denied.  Hawaii and County have made it so that open or unconcealed carry is extremely limited and is in no way a general right to carry and have erected numerous obstacles to concealed carry- the most facile of which is to just shelve applications interminably.

31.  Plaintiffs have a fundamental constitutional interest in the carry of their firearms;

32. County infringes on that right by acting in an ultra vires manner which is inherently arbitrary;

33. County is acting in an ultra vires manner because it allows, through intent, design, rule, custom, policy, practice, negligence, malfeasance, misfeasance, or nonfeasance, the delay of Plaintiffs' applications for CCW;

34. Because the County "did not have authority for the actions it took regarding" Plaintiffs' firearm rights, County's action was "ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation." *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir. 2007);

35. Thus, County has violated Plaintiffs' Due Process rights;

36. Plaintiffs allege that any delay in the issuance of CCW is unconstitutional but the Court need only find that County's actions here, delay in excess of one-hundred-twenty days, is a violation of due process because even by that standard County has violated the Second and Fourteenth Amendment rights of Plaintiffs;

## **STATEMENT OF LAW**

## **C**

## H.R.S. §134  Firearms

37. Hawaii law, specifically Hawaii Revised Statutes Section 134 *et seq*, is a comprehensive set of laws covering all aspects of firearms in Hawaii including everything from acquisition, possession, ownership, usage and carriage of arms[3];

38.  Prior to the United States Supreme Court decision in *Bruen*, Hawaii law, specifically HRS 134-9, dealt with the carriage of weapons, and it read-,

" **§134-9  Licenses to carry.**  (a)  In an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property, the chief of police of the appropriate county may grant a license to an applicant who is a citizen of the United States of the age of twenty-one years or more or to a duly accredited official representative of a foreign nation of the age of twenty-one years or more to carry a pistol or revolver and ammunition therefor concealed on the person within the county where the license is granted.  Where the urgency or the need has been sufficiently indicated, the respective chief of police may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty-one years or more, is engaged in the protection of life and property, and is not prohibited under section 134-7 from the ownership or possession of a firearm, a license to carry a pistol or revolver and ammunition therefor unconcealed on the person within the county where the license is granted.  The chief of police of the appropriate county, or the chief's designated representative, shall perform an inquiry on an applicant by using the National Instant Criminal Background Check System, to include a check of the Immigration and Customs Enforcement databases where the applicant is not a citizen of the United States, before any determination to grant a

[3] Hawaii state laws regarding all aspects of the Second Amendment and firearms are thorough, oppressive, and comprehensive.  Yet, Hawaii does not have an explicit preemption law that limits regulation to the state and in several circumstances allows or mandates that counties promulgate additional regulations, restrictions and processes.

license is made.  Unless renewed, the license shall expire one year from the date of issue.

(b)  The chief of police of each county shall adopt procedures to require that any person granted a license to carry a concealed weapon on the person shall:

(1)  Be qualified to use the firearm in a safe manner;

(2)  Appear to be a suitable person to be so licensed;

(3)  Not be prohibited under section 134-7 from the ownership or possession

of a firearm; and

(4)  Not have been adjudged insane or not appear to be mentally deranged.

(c)  No person shall carry concealed or unconcealed on the person a pistol or revolver without being licensed to do so under this section or in compliance with sections 134-5(c) or 134-25.

(d)  A fee of $10 shall be charged for each license and shall be deposited in the treasury of the county in which the license is granted.";

39.  Following *Bruen*, the state of Hawaii promulgated new laws regarding firearms, making all aspects of the exercise of Second Amendment rights much more difficult, onerous and expensive.  One aspect of the laws passed by the state of Hawaii dealt with CCW, but that law took effect on January 1, 2024.  The Plaintiffs herein all applied after *Bruen* and before January 1, 2024;

40.  Following *Bruen*, the state of Hawaii promulgated new rules regarding CCW.  Some of these new rules went into effect in June 2023 and others in

January 2024.  The rules regarding the issuance of CCW went into effect on

January 1, 2024.  Those rules are –

**§134-9  Licenses to carry.**  (a)  The chief of police of a county shall grant a license to an applicant to carry a pistol or revolver and ammunition concealed on the licensee's person within the State, if the applicant:

(1)  Satisfies each of the criteria established by or pursuant to subsection (d);

(2)  Is not prohibited under section 134-7 from the ownership, possession, or control of a firearm and ammunition;

(3)  Is not found to be lacking the essential character or temperament necessary to be entrusted with a firearm as set forth in subsection (h);

(4)  Is a citizen, national, or lawful permanent resident of the United States or a duly accredited official representative of a foreign nation;

(5)  Is a resident of the State; and

(6)  Is of the age of twenty-one years or more.

(b)  The chief of police of a county may grant to an applicant a license to carry a pistol or revolver and ammunition unconcealed on the licensee's person within the county where the license is granted, if the applicant:

(1)  Sufficiently establishes the urgency or need to carry a firearm unconcealed;

(2)  Is engaged in the protection of life and property;

(3)  Satisfies each of the criteria established by or pursuant to subsection (d);

(4)  Is not prohibited under section 134-7 from the ownership, possession, or control of a firearm and ammunition;

(5)  Is not found to be lacking the essential character or temperament necessary to be entrusted with a firearm as set forth in subsection (h);

(6)  Is a citizen, national, or lawful permanent resident of the United States; and

(7)  Is of the age of twenty-one years or more.

(c)  The chief of police of the appropriate county, or a designated representative of the chief of police, shall perform an inquiry on an applicant by using the National Instant Criminal Background Check System, to include a check of the Immigration and Customs Enforcement databases if the applicant is not a citizen of the United States, before any determination to grant a concealed or unconcealed license is made.

(d)  To be eligible to receive a license to carry a concealed or unconcealed pistol or revolver on the licensee's person, the applicant shall:

(1)  Submit the appropriate carry license application, in person, to the chief of police of the appropriate county, with:

(A)  All fields on the application form completed and all questions answered truthfully, under penalty of law;

(B)  All required signatures present on the application;

(C)  Any required documents attached to the application; and

(D)  Payment of the nonrefundable license application fee required under this section;

(2)  Be the registered owner of the firearm or firearms for which the license to carry will be issued; provided that this paragraph shall not apply to detectives, private detectives, investigators, and guards with an active license issued pursuant to chapter 463;

(3)  Not be prohibited under section 134-7 from the ownership, possession, or control of a firearm;

(4)  Have completed a course of training as described in subsection (e) and be certified as qualified to use the firearm or firearms for which the license to carry will be issued in a safe manner; and

(5)  Sign an affidavit expressly acknowledging that:

(A)  The applicant has read and is responsible for understanding and complying with the federal, state, and county laws governing the permissible use of firearms and associated requirements, including:

(i)  The prohibition on carrying or possessing a firearm in certain locations and premises;

(ii)  The prohibition on carrying more than one firearm on the licensee's person at one time;

(iii)  The prohibition on carrying a firearm on private property of another person without the express authorization of the owner, lessee, operator, or manager of the private property;

(iv)  The requirement to maintain possession of the license on the licensee's person while carrying a firearm;

(v)  The requirement to disclose information regarding the carrying of a firearm when stopped by law enforcement;

(vi)  The provision for absolute liability for injury or property damage proximately caused by a legally unjustified discharge of a firearm under section 663-9.5; and

(vii)  Laws regarding the use of deadly force for self-defense or the defense of another;

(B)  A license to carry issued under this section shall be void if a licensee becomes disqualified from the ownership, possession, or control of a firearm pursuant to section 134-7(a), (b), (d), or (f);

(C)  The license shall be subject to revocation under section 134-13 if a licensee for any other reason becomes disqualified under section 134-7 from the ownership, possession, or control of a firearm; and

(D)  A license that is revoked or that becomes void shall be returned to the chief of police of the appropriate county within forty-eight hours after the license is revoked or becomes void.

(e)  The course of training for issuance of a license under this section may be any course acceptable to the licensing authority that meets all of the following criteria:

(1)  The course shall include in-person instruction on firearm safety; firearm handling; shooting technique; safe storage; legal methods to transport firearms and secure firearms in vehicles; laws governing places in which persons are prohibited from carrying a firearm; firearm usage in low-light situations; situational awareness and conflict management; and laws governing firearms, including information regarding the circumstances in which deadly force may be used for self-defense or the defense of another;

(2)  The course shall include a component on mental health and mental health resources;

(3)  Except for the component on mental health and mental health resources, the course shall be conducted by one or more firearms instructors certified or verified by the chief of police of the respective county or a designee of the chief of police or certified by a nongovernmental organization approved for those purposes by the chief of police of the respective county or a designee of the chief of police, or conducted by one or more certified military firearms instructors;

(4)  The course shall require participants to demonstrate their understanding of the covered topics by achieving a score of at least seventy per cent on a written examination; and

(5)  The course shall include live-fire shooting exercises on a firing range and shall include a demonstration by the applicant of safe handling of, and shooting proficiency with, each firearm that the applicant is applying to be licensed to carry.

(f)  Upon passing the course of training identified in subsection (e), the applicant shall obtain from the instructor, and include as part of the applicant's application package, a certification as to the following:

(1)  The applicant's name, as confirmed by reviewing the applicant's government-issued photo identification;

(2)  The date and location of the firearm proficiency test;

(3)  The firearm or firearms that the applicant used in the firearm proficiency test;

(4)  The applicant's score; provided that an indication that the applicant passed or failed, without the score itself, shall be insufficient information for the purposes of the application; and

(5)  The instructor's qualifications to administer the firearm proficiency test.

The certification of the above information, signed by the firearms instructor who conducted or taught the course, providing the name, address, and phone number of the instructor, shall constitute evidence of successful completion of the course; provided that the instructor shall not submit a certification signed by the instructor for the instructor's own license application.  The course of training for issuance of a license under this section shall be undertaken at the licensee's expense.

(g)  An applicant for a license under this section shall:

(1)  Sign a waiver at the time of application, allowing the chief of police of the county issuing the license or a designee of the chief of police access to any records that have a bearing on the mental health of the applicant; and

(2)  Identify any health care providers who possess or may possess the records described in paragraph (1).

(h)  In determining whether a person lacks the essential character or temperament necessary to be entrusted with a firearm, the licensing authority shall consider whether the person poses a danger of causing a self-inflicted bodily injury or unlawful injury to another person, as evidenced by:

(1)  Information from a health care provider indicating that the person has had suicidal or homicidal thoughts or tendencies within the preceding five years;

(2)  Statements or actions by the person indicating any dangerous propensity or violent animus toward one or more individuals or groups, including groups based on race, color, national origin, ancestry, sex, gender identity, gender expression, sexual orientation, age, disability, religion, or any other characteristic, and the propensity or animus is of a nature or to an extent that would objectively indicate to a reasonable observer that it would not be in the interest of the public health, safety, or welfare for the person to own, possess, or control a firearm or ammunition; or

(3)  Other information that would lead a reasonable, objective observer to conclude that the person presents or would present a danger to the community as a result of carrying a firearm in public or intends or is likely to use a firearm for an unlawful purpose or in an unlawful manner.

(i)  A nonrefundable fee of $150 shall be charged for each license application submitted under this section.  The fee shall be chargeable by and payable to the appropriate county and shall be used for expenses related to police services.  The issuing authority shall waive the fee required by this subsection upon a showing of financial hardship by the applicant.

(j)  If the applicant satisfies each of the requirements for a concealed carry license, an application for a concealed carry license submitted to the chief of police of the appropriate county under this section shall be approved within a reasonable time after receipt of all required application materials.  If the applicant does not satisfy one or more of the requirements for a concealed carry license, the license shall be denied within a reasonable time after receipt of the application materials.  If an application is denied, the chief of police or a designee of the chief of police shall notify the applicant of the denial in writing, stating the ground or grounds for the denial and informing the applicant of the right to seek review of the denial through a hearing pursuant to subsection (k).  If the chief of police does not grant or deny a submitted application for a concealed carry license within one

hundred twenty days following the date of the application, the application shall be deemed denied as of that date for purposes of subsection (k).

(k)  If an application under this section is denied, a person or entity aggrieved by the denial shall be entitled to a hearing before the chief of police of the appropriate county or a designee of the chief of police.  A person or entity aggrieved by the denial shall submit a request for a hearing in writing to the chief of police of the appropriate county no later than thirty days following the date of the decision or determination notice.  The hearing shall constitute a contested case hearing for purposes of chapter 91.  Following the hearing and final decision, an aggrieved party shall be entitled to a judicial review proceeding in state circuit court in accordance with section 91-14.

(l)  If an application pursuant to this section is approved, the chief of police shall issue the applicant a license that contains, at minimum:

(1)  The licensee's name;

(2)  The licensee's address;

(3)  A photograph of the licensee taken within ninety days before issuance of the license;

(4)  The county of issuance;

(5)  A notation as to whether the license permits concealed or unconcealed carry;

(6)  The serial number of each registered firearm that the licensee may carry pursuant to the license; and

(7)  The license expiration date.

The license issued under this subsection shall not constitute a government-issued photo identification document under federal or state law.

(m)  Unless renewed, a concealed or unconcealed license shall expire four years from the date of issue.

(n)  A license to carry issued under this section shall be void if a licensee becomes disqualified from the ownership, possession, or control of a firearm pursuant to section 134-7(a), (b), (d), or (f).  If a licensee for any other reason becomes disqualified under section 134-7 from the ownership, possession, or control of a firearm, the license shall be subject to revocation under section 134-13.  A license that is void or revoked shall be returned to the chief of police of the appropriate county within forty-eight hours after the license becomes void or is revoked.

(o)  The chief of police of each county shall adopt procedures to implement this section.

(p)  The chief of police of each county shall establish procedures and criteria for the renewal of licenses issued under this section.  No license renewal shall be granted if an applicant for a renewed license does not satisfy, or no longer satisfies, the eligibility criteria for a new license set forth in subsections (a) through (d).  As a precondition for the renewal of licenses issued under this section, the chief of police of each county may establish reasonable continuing education, training, and certification requirements, including requirements pertaining to the safe handling of firearms and shooting proficiency.  A nonrefundable fee of $50 shall be charged for each license renewal application submitted under this section.  The fee shall be chargeable by and payable to the appropriate county and shall be used for expenses related to police services.  The issuing authority shall waive the fee required by this subsection upon a showing of financial hardship by the applicant.

(q)  No person carrying a firearm pursuant to a license issued under this section shall intentionally, knowingly, or recklessly carry more than one firearm on the licensee's person at one time.

(r)  A license issued by the chief of police of a county within the State under subsection (a) to carry a pistol or revolver and ammunition concealed on the licensee's person shall be valid for use in each county within the State.

## STATEMENT OF LAW

## D

### County specific rules regarding CCW

41.  Prior to *Bruen*, based upon information and belief, the counties only issued open carry permits for armored vehicle drivers and not to the general public;

42.  Prior to *Bruen*, the counties had only issued less than a half-dozen carry concealed permits in the prior decades;[4]

43.  Following *Bruen*, counties in Hawaii promulgated new rules.  County[5] promulgated the following rules-

§15-12 Definitions.  Unless the context indicates otherwise, as used in this chapter:

"Acquire" has the same meaning as in Section 134-1, Hawaii Revised Statutes.

---

[4] *See e.g. Young v. Hawaii*, 896 F.3d 1044, 1071 n.21 (9th Cir. 2018) ("Hawaii counties appear to have issued only *four* concealed carry licenses in the past *eighteen years. See* 2000 Haw. Att'y Gen. Reps., *Firearm Registrations in Hawaii, 2000 et seq*;"). *Young* was vacated and reversed by the U.S. Supreme Court following the *Bruen* decision.

[5] Different counties promulgated different rules at different times.  County promulgated these rules in October 2022. County is in the process of promulgating additional rules and possible changes to these rules.  All of the Plaintiffs applied for CCW under these rules.

"Antique pistol or revolver" has the same meaning as in Section 134-1, Hawaii Revised Statutes.

"Concealed" means entirely hidden from view of the public and not discernable by ordinary observation, even if covered by clothing, such that a reasonable person without law enforcement training would be unable to detect the presence of a firearm.

"Concealed License" means a License to Carry Concealed Firearm.

"Detective", "private detective", or "investigator" has the same meaning as in Section 463-1, Hawaii Revised Statutes.

"Detective Agency" has the same meaning as in Section 463-1, Hawaii Revised Statutes.

"Firearm" has the same meaning as in Section 134-1, Hawaii Revised Statutes.

"Guard" has the same meaning as in Section 463-1, Hawaii Revised Statutes.

"Guard Agency" has the same meaning as in Section 463-1, Hawaii Revised Statutes.

"License to Carry Firearm" and "License" means both Concealed Licenses and Unconcealed Licenses.

"Pistol" or "revolver" has the same meaning as in Section 134-1, Hawaii Revised Statutes.

"Unconcealed" means not concealed.

"Unconcealed License" means a License to Carry Unconcealed Firearms.

§15-13- Normal Business Hours.  The firearms Unit of the Records and Identification Division, Honolulu Police department, 801 South Beretania Street, Honolulu, Hawaii,

96813, shall maintain operating hours on Wednesdays, excluding holidays, of 7:45 a.m. to 6:30 p.m., on the condition that firearm applicants in line by 6:30 p.m. will be processed and not turned away.  The Firearms Unit shall maintain operating hours on Mondays, Tuesdays, Thursdays, and Fridays, excluding holidays, of 7:45 a.m. to 4:00 p.m.  These operating hours are included within the meaning of "normal business hours" as used throughout this chapter.

§15-14 Permit to Acquire Firearms. (a) Pursuant to Chapter 134-2, Hawaii Revised Statutes, no person shall acquire a firearm, whether serviceable or unserviceable, usable or unusable, modern or antique, registered under prior law or by a prior owner or unregistered, either by purchase, gift, inheritance, bequest, or in any other manner, whether procured in the State or imported by mail, express, freight, or otherwise, until the person has first obtained a Permit to Acquire firearms from the Chief of Police.

(b) Any pistol or revolver, which is registered under, and in respect of which the owner has fully complied with, Section 134-2, Hawaii Revised Statutes, may be loaned to another even though the other person is a minor, upon a target range or similar facility, for a period not longer than to allow the other person to then and there use it for target shooting, without a permit.  The registered owner shall accompany such person during the time of use of the firearm.

(c) The Chief of Police may issue permits in the City and County of Honolulu to:

(1) Persons twenty-one years or older.

(2) Duly accredited official representatives of foreign nations.

(3) Aliens twenty-one years or older for the use of rifles or shotguns.  Such permits shall not exceed ninety days duration, after the alien has first procured a hunting license pursuant to Section 183D-22, Hawaii Revised Statutes.

§15-15.  Procedures for acquiring and registering firearms.  (a) Any person attempting to acquire a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, shall appear at the Firearms Unit during normal business hours and submit:

(1) Valid government-issued photo identification.
(2) All completed forms as prescribed by the Honolulu Police department and the department of the Attorney General pursuant to Sections 134-2 and 134-3, Hawaii Revised Statutes.
(3) For Permits to acquire a pistol or revolver, proof of training as required by Section 134-2(g), Hawaii Revised Statutes.

(b) The Firearms Unit shall conduct a background check of the applicant, in accordance with Sections 134-2 and 134-7, Hawaii Revised Statutes, to ensure the applicant is lawfully permitted to possess or acquire a firearm.

(c) No Permit to Acquire firearms shall be issued to an applicant earlier than fourteen calendar days after the date of the application; provided that a Permit shall be issued or the application denied before the twentieth day from the date of application.

(d) Permits to acquire any pistol or revolver shall require a separate application and Permit for each transaction.  The permitting and registration process for pistols and revolvers is as follows:

(1) Purchase from a licensed dealer:

(A) After purchasing the pistol or revolver from the dealer but before taking possession of the pistol or revolver, the applicant shall apply for a Permit with the Firearms Unit and shall provide the serial number, make, model, caliber, and barrel length of the pistol or revolver being acquired, as well as the seller's business name, address, and phone number.

(B) Within ten days after issuance, the applicant shall present the Permit to the dealer and take possession of the pistol or revolver.

(C) Any Permit that is not used for the acquisition of a pistol or revolver within ten days after issuance shall be void.  Such Permits shall be returned to the firearms Unit for proper recordation and disposition.

(D) The dealer shall cause the Permit to be delivered to the Firearms Unit within 48 hours of the applicant taking possession of the firearm.

(E) Within five days of the applicant taking possession of the pistol or revolver, the applicant shall complete the registration on-line or in person with the Firearms Unit.

(2) Purchase of transfer from a private party:

(A) The applicant shall apply for a Permit with the Firearms Unit and shall provide the serial number, make, model, caliber, and barrel length of the pistol or revolver being acquired, as well as the individual seller's name, address, and phone number.

(B) Within ten days after issuance, the applicant shall present the Permit to the seller or transferor and take possession of the pistol or revolver.

(C) Any Permit that is not used for the acquisition of a pistol or revolver within ten days after issuance shall be void.  Such Permits shall be returned to the Firearms Unit for proper recordation and disposition.

(D) The seller or transferor shall cause the Permit to be delivered to the Firearms Unit within 48 hours of the applicant taking possession of the firearm.

(E) Within five days of the buyer taking possession of the firearm, the applicant shall complete the registration in person

with the Firearms Unit and present the firearm to the Firearms Unit for inspection.

(e) Permits to Acquire any rifle or shotgun shall entitle the applicant to purchase rifles or shotguns for a period of one year from the date of issue without a separate application and Permit for each acquisition, subject to Sections 134-2(e), 134-7, and 134-13, Hawaii Revised Statutes.  The applicant shall surrender the Permit to the firearms Unit no later than 30 days after expiration.  The permitting and registration process for rifles and shotguns is otherwise the same as that for pistols and revolvers, as set forth in subsection (d)(1) and (d)(2).

(f) The applicant's information from the Permit shall be recorded by the firearms clerk on the firearms Registration form.

(g) The applicant shall be required to sign the Firearms Registration form either electronically or in ink.

(h) The Firearms Registration form does not authorize the carrying of the firearm, either concealed or unconcealed, on the person.

§15-16.  Registering firearms brought in from out of the state. Pursuant to Section 134-3, Hawaii Revised Statutes, every person arriving in the State who brings a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, shall register the firearm with the Firearms Unit as follows:

(1) Within five days after arrival of the person or of the firearm, whichever arrives later, the person shall complete the registration in person with the Firearms Unit and present the firearm to the Honolulu Police Department for inspection.
(2) The person shall submit all completed forms as prescribed by the Honolulu Police department and the department of the Attorney General pursuant to Section 134-3, Hawaii Revised Statutes, and shall be fingerprinted and photographed by firearms Unit personnel.  The person shall list the person's place of business, residence or sojourn.

(3) Firearms Unit staff shall conduct a background check of the applicant in accordance with Sections 134-3 and 134-7, Hawaii Revised Statutes, to ensure the applicant is lawfully permitted to possess a firearm.

(4) If the applicant is disqualified from possessing a firearm, the applicant shall surrender all firearms in accordance with Section 134-7.3, Hawaii Revised Statutes.

§15-17 Procedures for applying for a Permit Allowing Minors to Carry Firearms.

(a) Any minor requesting a Permit Allowing Minors to Carry Firearms for the sole purpose of hunting as required by Section 134-9(b), Hawaii Revised Statutes, shall:

(1) Apply for a Permit Allowing Minors to Carry Firearms at the Honolulu Police Department Records and Identification Division, 801 South Beretania Street, Honolulu, Hawaii;

(2) Be accompanied by a parent or legal guardian;

(3) Present a valid hunting license, as provided in Section 183D-22, Hawaii Revised Statutes, at the time of the application; and

(4) Provide the personal information requested on the application form.

(b) Upon receipt of the above information, the firearms clerk shall conduct a background check of the individual in the Records and Identification Division files.

(c) Upon completion of the background checks and a determination that the criteria set forth in Chapter 134, Hawaii Revised Statutes, have been satisfied, the clerk shall:

(1) Take two (2) photographs of the applicant and attach the photos to the Permit in the designated positions;

(2) Affix the right thumbprint of the applicant on the permit in the designated position;

(3) Ensure that the entire form is completed in duplicate;

(4) Fill in the expiration date at the bottom of the Permit;

32

(5) Emboss the Permit over the photograph with the Honolulu Police department's seal;

(6) Obtain a signature from a Records and Identification Division administration supervisor, who signs in lieu of the Chief of Police; and

(7) Issue the original Permit to the applicant and advise the individual that the applicant is to return the Permit to the Honolulu Police Department within one (1) week after the Permit expires.  The second copy of the Permit is retained by the Firearms Unit as a control copy.


Subchapter 2

Applications for License to Carry firearm, Concealed or Unconcealed

§15-18 Purpose and Intent; existing applications; severability.

(a) Pursuant to Section 134-9, Hawaii Revised Statutes, the following administrative rules are intended to govern the processing of applications for Licenses to Carry Firearm, concealed or unconcealed, by the Honolulu Police department and shall be complied with by Honolulu Police department personnel, including the Chief of Police.

(b) These rules shall apply to all License applications that are pending on the effective date of these rules.

(c) Every provision in these rules and every application of these provisions in these rules is severable from each other as a matter of law.  If any provision of these rules or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of these rules, which can be given effect without the invalid provision or application.  These rules shall be construed to be enforceable up to, but no further than, the maximum possible extent consistent with federal and state law.

§15-19  Qualifications, training, and testing to use firearm in a safe manner.

(a) Pursuant to Section 134-9(b)(1), Hawaii Revised Statutes, an applicant for a License to Carry Firearm shall "[b]e qualified to use the firearm in a safe manner" before receiving a License.

(b) No person shall be issued a License unless the person, at any time prior to the issuance of the License, has completed a firearms training or safety course that satisfies the requirements of Section 134-2(g)(4), Hawaii Revised Statutes.

(c) In addition to the requirements of subsection (b), every applicant for a License shall successfully complete a firearms certification program, which shall include a lecture session, written examination, and shooting proficiency test. Every applicant shall complete the lecture session as set forth in subsection (d)(1) and the written examination as set forth in subsection (d)(2) at least once within the two years preceding the date of the application. Every applicant shall complete the applicable shooting proficiency test as set forth in subsection (d)(3) at least once within the 90 days preceding the date of the application.

(d) The firearm certification program shall consist of the following:

(1) A minimum four-hour lecture session that includes firearm safety, proper use of firearms, firearm restrictions related to domestic violence, firearm use in low-light situations, firearm retention, risks of carrying firearms in public, safe carrying and storage of concealed and unconcealed firearms, and chapters 134 and 703, Hawaii Revised Statutes. The lecture shall include an interactive question and answer session on all topics.

(2) A written multiple-choice examination on the topics listed in subsection (d)(1). The applicant shall attain a score of at least 70% on the examination.

(3) A shooting proficiency test using a National Rifle Association certified target.

(A) The shooting proficiency test for detective, private detectives, investigators, and guards shall be as

follows, for which the applicant shall attain a minimum score of 210 out of a possible 300 points.

    (i)     Ten (10) rounds at 15 yards, rapid fire, 15 seconds.

    (ii)    Ten (10) rounds at 15 yards, times fire, 25 seconds.

    (iii)   Ten (10) rounds at 25 yards, slow fire, 5 minutes

(B) The shooting proficiency for all other applicants shall be as follows, for which the applicant shall attain a minimum score of 75 out of a possible 125 points:

    (i)     Three-yard line: 2 rounds in 6 seconds from the applicant's holster; three times (6 rounds/ 4 second draw- 2 second split).

    (ii)    Five-yard line: 2 rounds in 6 seconds from the applicant's holster; two times (4 rounds/ 4 second draw- 2 second split).

    (iii)   Seven-yard line: 5 rounds in 13 seconds from the applicant's holster; one time ( 5 rounds/ 4 second draw- 2.25 second split).

    (iv)   Ten-yard line: 5 rounds in 15 seconds from the applicant's holster; one time (5 rounds/ 4 second draw- 2.75 second split)

    (v)    Fifteen-yard line: 5 rounds in 20 seconds from the applicant's holster; one time (5 rounds/ 4 second draw- 4 second split).

            An applicant whose firearm holds fewer rounds that required for each of these items shall be permitted to reload the applicant's firearm.

(e) The firearm certification program shall be led by an instructor verified by the State of Hawaii or the Honolulu Police Department.  Absent a verification process formalized by the State of Hawaii, the Training Division shall develop clear and objective criteria to verify qualifications of instructors, with verification to be valid for

two years.  Such clear and objective criteria shall require the instructor to provide evidence of the following:

(1) Valid, in-person certifications by nationally recognized firearms manufacturers or organizations, demonstrating the instructor's qualifications to use a firearm proficiently and safely and to educate others regarding the same.

(2) The instructor's qualifications to teach others regarding the law in Hawaii on self-defense and use of force, including the requirements of chapters 134 and 703, Hawaii Revised Statutes.  The instructor may conduct this portion of the training; alternatively, an active attorney in good standing with the Hawaii State Bar Association may conduct this portion of the training.

(3) The instructor's ability to provide reliable certifications regarding applicants' qualifications to the Firearms Unit. An applicant to be an instructor shall be disqualified if the applicant was previously convicted of any criminal offense involving dishonesty or fraud, or if the applicant was previously found liable in any civil court for any act involving dishonesty or fraud.

The instructor shall also provide the Honoluul Police department with a written examination to be used, and the instructor's verification shall be rejected if the written examination does not meet the requirements of this section.  An application shall be rejected if the applicant is legally prohibited from possessing or handling firearms.

§15-20 Application procedures for License to Carry Firearm, concealed or unconcealed; applications for multiple licenses.  (a) Every applicant shall have a mailing address in Hawaii other than a Post office box and be 21 years of age or older, and shall submit:

(1) The completed Honolulu Police department Application for License to Carry Concealed Firearm or License to Carry Unconcealed Firearm, including any and all forms designated by the Honolulu Police

Department to implement Sections 134-7 and 134-9, Hawaii Revised Statutes, and these rules.

(2) A copy of the signed State of Hawaii Firearms Registration, registered in the applicant's name, for the handgun to be carried by the applicant if the applicant receives a License.

(3) The completed and signed HIPAA compliant authorization for release for all mental health information, including psychiatric, behaviorial health, and substance abuse information, from all medical sources, including but not limited to all health care providers, health care plans, clinics, laboratories, pharmacies, medical facilities, other health care providers, and government entities.  The applicant shall also complete any forms required by the applicant's health care provider or relevant government entity for release of mental health information.

(4) The completed and signed State of Hawaii, Adult Mental Health Division Authorization for Use or Disclosure of protected Health Information form, ir required by the State of Hawaii.

(5) The completed and signed State of Hawaii Permit to Acquire Firearms Application Questionnaire.

(6) Valid government-issued photo identification.

(7) Documentation that the applicant has completed a firearms training or safety course that satisfies the requirements of section 134-2(g)(4), as set forth in section 15-19(b).

(8) A notarized affidavit from the instructor of the firearm certification program set forth in sections 15-19(c) and 15-19(d), attesting to the following:

(A) The applicant's legal name;
(B) The instructor's name and contact information;
(C) The applicant's score on the written examination;
(D) The applicant's score on the shooting proficiency test;
(E) The date and time the applicant completed the program;

(F) The location of the program; and

(G) The firearm used by the applicant to complete the program.

(9) One United States passport-sized, front-facing photo of the applicant;

(10)   If applicable, documentation as set forth in subsection (b).

(11)   A non-refundable fee of $10.00, or, if higher, the maximum amount permitted by state law for the License and any background check or other processing fees.

(12)   Any other forms prescribed by the Department of the Attorney General or the Honolulu Police Department required to complete the background check and mental health screening required by law.

(b) if the applicant became a resident of Hawaii within the five years preceding the date of the application, or if the applicant became a resident of Hawaii more than five years prior to the date of the application and lived outside of Hawaii for more than 180 consecutive days withinb the five years preceding the date of the application, the applicant shall provide mental health information as follows:

(1) Mental health records from the health department of every state, province, or equivalent governmental unit outside of Hawaii where the applicant lived for more than 180 consecutive days within the five years preceding the date of the application, to be sent directly to the Honolulu Police Department from the governmental entity. Applicants who, within the five years preceding the date of the application, were stationed outside Hawaii due to federal governmental service shall have mental health records sent to the Honolulu Police Department from the relevant federal governmental entity, but need not obtain records from the foreign or out-of-state government. Applicants who did not live in any location for more than

180 consecutive days shall provide an explanation to the Honolulu Police Department; or

(2) Certification from a physician, psychologist, or psychiatrist, licensed to practice in Hawaii and completed no more than 90 days before the submission of the application, attesting to the applicant's mental fitness to carry a firearm, provided that the physician, psychologist, or psychiatrist shall personally evaluate the applicant for no less than 45 minutes before so attesting, and provided further that nothing in these rules shall require any health care professional to conduct such examination.

(c) An applicant who applies for multiple licenses, either concurrently or within 90 days of submitting a complete application pursuant to subsection (a), shall submit:

(1) The completed Honolulu Police Department Application for License to Carry Concealed Firearm or License to Carry Unconcealed Firearm;

(2) An affidavit as provided in subsection (a)(8), attesting that the applicant has satisfied the shooting proficiency test set forth in section 15-19(d)(3) within the 90 preceding the date of the application for each firearm for which a license is sought;

(3) One United States passport-sized, front facing photo of the applicant;

(4) A non-refundable fee of $10.00 or higher, the maximum amount permitted by State law for the License and any background or other processing fees; and

(5) Any other forms required by state or federal law.

§15-21 Detectives, private detectives, investigators, guards, detective agencies, and guard agencies. (a) Any Detective Agency or Guard agency with an active license issued pursuant to Chapter 463, Hawaii Revised Statutes, which requests a License to Carry Firearm for any of its

on-duty personnel, or any Detective, Private Detective, Investigator, or Guard with an active license issued pursuant to Chapter 463, Hawaii Revised Statutes, who requests a License to Carry firearm for on-duty use, shall submit a written request with justification to the chief of Police.  Such justification shall include:

(1) Nature of the security work to be undertaken.
(2) Necessity for each applicant to carry a firearm.
(3) Anticipated dates, times, and locations where applicants shall carry firearms.
(4) Address of the principal place of business of the Detective Agency or Guard Agency, or principal place of business of the Detective, Private Detective, Investigator, or Guard, where the firearms will be stored.
(5) Name, address, date of birth, physical description, social security number, and previous employment of each applicant for whom a License to Carry Firearm is requested.
(6) Proof of licensure as a Detective Agency or Guard agency, or proof of licensure as a Detective, Private Detective, Investigator, or Guard, if requesting the License for oneself.

(b) Each individual applicant to be licensed shall complete the training and testing required by section 15-19 and submit all documents required by section 15-20, in addition to the following:

(1) A valid license pursuant to Section 463-6 or 463-7, Hawaii Revised Statutes; and
(2) A notarized statement by each employee for whom a License to Carry Firearm is requested, that the applicant has never been arrested or convicted of any felony firearms violation, crime of violence, or the illegal use, possession or sale of drugs, or confined due to mental illness; provided that applicants under this section are not required to have a preexisting Permit to Acquire

Firearms or a firearm registered in the applicant's name before applying for a License under this section.

(c) Upon receipt of the above information at the office of the Chief of Police, a check by the Records and Identification Division and any allied agencies shall be conducted of each applicant.

(d) The Chief of Police may limit the number of employees who shall be licensed to carry a firearm for each Detective Agency or Guard Agency applying for such licenses.  Such determination shall be based on strict necessity as determined by the Chief of Police.

(e) Pursuant to section 16-97-17, Hawaii Administrative Rules, no individual may carry a firearm while on-duty and engaged in the business of being a Detective, Private Detective, Investigator, or Guard, except with a License granted pursuant to this section.  Any individual without a License issued pursuant to this section who carries a firearm while on-duty and engaged in the business of being a Detective, Private Detective, Investigator, or Guard shall be referred to the appropriate authorities for prosecution pursuant to Section 463-15, Hawaii Revised Statutes.

(f) An authorized representative of the Detective Agency or Guard Agency shall certify that the agency and all employees shall comply with all requirements of Chapters 134 and 463, Hawaii Revised Statutes, and these rules.  If an agency's employee fails to comply with the requirements of Chapters 134 or 463, Hawaii Revised Statutes, or these rules, the Chief may, pursuant to section 16-97-17, Hawaii Administrative Rules, revoke the Licenses for other agency employees that were issued pursuant to this section; provided that such a revocation shall not require a one-year waiting period, as set forth in section 15-27, before an

otherwise compliant employee may apply for a new License with a different agency or on the employee's own behalf.  For a reasonable period of time not to exceed one year following the revocation of a License of any agency employee to carry while on duty, the Chief may also deny new applications submitted by the agency's employees seeking to carry while on duty.  The Chief shall make such decisions objectively, based upon the severity of the offense and the offender's history of compliance or noncompliance with the requirements of Chapters 134 or 463, Hawaii Revised Statutes, or these rules.

(g) Licenses issued pursuant to this section may be Unconcealed, Concealed or both.  The Chief shall evaluate the applicant's needs and, in the Chief's discretion, determine what type of License will best promote public safety.

§15-22 Initial review of application by firearms Unit; background checks. (a) An application is not deemed received by the Honolulu Police department until the complete application, including all required forms and information, is received by the Honolulu Police Department.  The Firearms Unit shall not take further action on an incomplete application except as set forth in subsection (b).  Incomplete applications shall be deemed to have been denied on the 90th day following submission by the applicant, measured from the date of the latest submission by the applicant.

(b) Firearms Unit personnel shall review the application for completeness. If an application is incomplete, Firearms Unit personnel shall advise the applicant as to what information or items are missing, as follows:

(1) if the applicant is present, Firearms Unit personnel shall advise the applicant verbally.  If the applicant provides the missing information and the application is deemed complete, Firearms Unit personnel shall proceed

with processing the application.  If the applicant does not provide the missing information upon being advised verbally by firearms Unit personnel, Firearms Unit personnel shall document the verbal guidance given.

(2) if the applicant is not present, Firearms Unit personnel shall advise the applicant in writing.

(c) If the Firearms Unit deems the application to be complete, the Honolulu Police Department shall conduct the following background checks on the applicant:

(1) Local police involvements (current and archive records management systems)

(2) State of Hawaii- Electronic Bench Warrant (EBW) search.

(3) CJIS Hawaii query- for Hawaii arrest history and disposition information.

(4) National Instant Criminal Background Check (NCIS) which includes:

(A) National crime Information Center (NCIC) warrants.

(B) Interstate Identification Index (III)- a national index of criminal histories

(C) NICS index- index of persons not eligible to receive firearms in the U.S.

(D) Immigration and Customs enforcement databases- regarding whether the applicant is a citizen, a national, or a lawful permanent resident of the United States.

(E) A query of the State of Hawaii Adult Mental Health Divisions files for State of Hawaii mental health records.

(F) A query of Hawaii's medical marijuana cardholder database to discern whether the applicant holds a medical

marijuana permit (*see* U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, "Open letter to all federal firearm licensees," Sept. 21, 2011).

(G) JIMS, eCourt Kokua, Ho'ohiki, or other comparable Hawaii Judiciary databases, for State court orders and records.

(H) Any other databases required by law.

(5) If applicable, review of mental health records from other jurisdictions, or attestation from physician, psychologist, or psychiatrist, pursuant to section 15-20(b).

(d) More than one person may receive a License to carry a single firearm- such as when spouses share a firearm- provided that each person shall have a License for each firearm to be carried.

(e) Unless the application materials demonstrate, clearly and on their face, that an applicant cannot meet the eligibility criteria set forth in these regulations, each applicant shall be entitled to an interview with Firearms Unit personnel to present any additional information. Upon request by the applicant, Firearms Unit personnel shall conduct the interview by telephone or by video conference, as chosen by the applicant; alternatively, Firearms Unit personnel may conduct the interview in person upon the request of the applicant and at the discretion of Firearms Unit personnel.

(f) The Department has discretion to forgo one or more portions of a background check if the Department conducted a full background of the applicant within the preceding 30 days.

§15-23 Standards for issuance of License to Carry Concealed Firearm.  The Chief shall be guided by the

following standards in determining whether to grant or deny an application for a License.

(1) Pursuant to Section 134-9(b), Hawaii Revised Statutes, an applicant for a License shall "[a]ppear to be a suitable person to be so licensed." Being a "suitable person" means that the applicant does not present specific and articulable indicia that would objectively indicate to a reasonable observer, when considering relevant objective factors, that the applicant poses a heightened risk to public safety, provided that the burden to prove that the applicant poses such a risk is on the Department, not the applicant. The Chief may apply the following objective factors when determining whether an applicant displays specific and articulable indicia that the applicant poses a heightened risk to public safety such that the applicant is not a "suitable person to be so licensed."

(A) Whether the applicant has been involved in any incidents of alleged domestic violence within the ten years preceding the application;
(B) Whether the applicant has been involved in any incidents of careless handling, storage, or carrying within the ten years preceding the application;
(C) Whether the applicant has been involved in incidents of alcohol or drug abuse, including but not limited to operating a vehicle under the influence of an intoxicant, within the ten years preceding the application; or
(D) Whether the applicant has been involved in other violent conduct within the ten years preceding the application.

(2) Pursuant to Section 134-7 and 134-9(b), Hawaii revised Statutes, an applicant for a License shall "[n]ot have been adjudges insane or not appear to be mentally deranged." Being a person who does "not appear to be mentally deranged" means that the

applicant does not present specific and articulable indicia that would objectively indicate to a reasonable observer, when considering relevant objective factors, that the applicant is not capable of being a suitable, responsible, and law-abiding user of firearms, provided that the burden to prove that the applicant is incapable is on the Department, not the applicant. Such specific and articulable indicia may include suicidal ideations, homicidal ideations, or potential dangerousness, including a violent animus towards one or more groups based on race, color, national origin, ancestry, sex, gender identity, gender expression, sexual orientation, age, disability, religion, or other characteristic, such that a reasonable person would conclude that the applicant harbored an intention to use a firearm in public to attack others rather than for self-defense. The Chief may consider the information provided as part of the application, as well as any other information available to the Honolulu Police Department or the general public, in determining whether an applicant presents such specific and articulable indicia.

§15-24 Standards for issuance of License to Carry Unconcealed Firearm. The Chief shall determine whether, in addition to the requirements for a Concealed License, an applicant for an Unconcealed License has, in the Chief's discretion, satisfied the requirements set forth in Section 139, Hawaii Revised Statutes. For applications that satisfy the objective criteria, the Shall be guided by the following standards:

(1) Pursuant to HRS §134-9(a), the applicant must "sufficiently indicate" that the applicant has an "urgency" or "need" to carry a firearm and is "engaged in the protection of life and property."

    (A) The "urgency" or "need" is "sufficiently indicated" only if an applicant has a need to carry a firearm for protection that substantially exceeds

the need possessed by ordinary law-abiding citizens.

(B) Being "engaged in the protection of life and property" does not require an applicant to be employed in a job that entails the protection of life or property, such as a Guard, but it does require the applicant to be taking part, generally, in the protection of life, property, or both.

(C) The life or property being protected is not limited to the applicant's life or property but can extend to that of others.

(2) The Chief may consider the following non-exhaustive list of factors when determining whether an applicant has an "urgency" or "need" to carry a firearm and is "engaged in the protection of life and property":

(A) Whether the applicant has been subjected to a credible threat of harm to life, property, or both.

(B) Whether there has been corroboration of the threat, from police, government, or other records; from prior history with the same person or at the same location; or from witnesses, documents, or other first-hand sources.

(C) Whether the applicant has been the victim of crime, such as domestic abuse, in which the applicant was specifically targeted, as opposed to the applicant being the victim of random crime.

(D) Whether temporary restraining orders, protective orders, or other orders or proceedings demonstrate a risk of harm to life or property.

(E) Whether the applicant's profession supports the need for a firearm due to the heightened risk of attack or violence that the applicant faces.

(F) Whether the applicant lives or works in a rural area far from police protection, as opposed to living and working in an urban area with a significant police presence.

(G) Whether the applicant is employed in a job that requires protection of the life or property of others.

(H) Whether a spouse, close family member, or other dependent of the applicant faces a heightened risk of bodily harm and the applicant is engaged in the protection of that person.

(I) Whether the applicant has an "urgency" or "need" to carry a firearm unconcealed rather than concealed, taking into account considerations such as whether an Unconcealed License will enable the applicant to protect life or property more effectively that a Concealed License, and whether the intended use of the Unconcealed License if likely to cause terror and panic among the general public.

(J) Other factors not mentioned above but reasonable and appropriate to the decision whether to grant or deny an application for an Unconcealed License.

(3) The applicant must be "of good moral character". Being "of good moral character" means that the applicant does not present specific and articulable indicia that the applicant poses a heightened risk to public safety.

(4) The Chief may consider the following non-exhaustive list of factors when determining whether an applicant displays specific and articulable indicia that the applicant poses a heightened to public safety such that the applicant is not "of good moral character":

(A) Whether the applicant has been involved in any incidents of alleged domestic violence within the ten years preceding the application.

(B) Whether the applicant has been involved in any incidents of careless handling, storage, or carrying of a firearm within ten years preceding the application.

(C) Whether the applicant has been involved in incidents of alcohol or drug abuse, including but not limited to operating a vehicle under the influence of an intoxicant, within the ten years preceding the application.

(D) Other factors not mentioned above but reasonable and appropriate to the decision whether to grant or deny an application for an Unconcealed License.

§15-25 Chief's Decision on application for License to Carry Firearm, concealed or unconcealed.  (a) The Firearms Unit shall forward the applicant's background check results, application, all attachments, and a cover memo noting all findings to the Chief for the Chief's review and decision.

(b) For applications for Concealed Licenses, the Chief shall evaluate whether the applicant meets the objective criteria as required under Hawaii law and as set forth herein.  The Chief shall consider prohibitions found in Sections 134-7 and 134-9(b), Hawaii Revised Statutes, including age, criminal history, and mental health, and the standards set forth in these rules.  If the applicant does not satisfy these criteria, the application shall be denied on that basis.

(c) For applications for Unconcealed Licenses, the Chief shall evaluate whether the applicant meets the objective criteria as required under Hawaii law and as set forth herein, and whether the applicant has met the criteria for an Unconcealed License as set forth in Section 134-9, Hawaii Revised Statutes, and section 15-24.

(d) The Chief and Honolulu Police Department personnel shall consider each application based on the facts and circumstances of each applicant.  The Chief and Honolulu Police Department personnel shall not act arbitrarily or capriciously and shall not reject applications based merely on preconceived notions or beliefs.  All decisions to grant or deny applications shall be based on an objective application of the defined criteria set forth herein.

(e) If, at any time during the Chief's processing of an application, the Chief feels that the applicant may be able to meet the eligibility criteria but further information or clarification is needed before the Chief is able to make a final

decision, Firearms Unit personnel shall invite the applicant, in writing, to submit additional information.

(f) Upon the Chief reaching a decision, the applicant shall be sent a written decision by certified mail.

(1) If an application for a Concealed License is granted, the Chief shall not impose any special conditions and shall issue the license card in a timely matter. The licensee shall appear at the Firearms Unit to be photographed, after which the License shall be issued.

(2) If an application for an Unconcealed License is granted, an approval letter shall be sent to the licensee via certified mail.  The approval letter shall indicate whether any special conditions are attached to an Unconcealed License and shall explain the reasons for such conditions.  The Chief may grant an Unconcealed License without special conditions, and shall not impose unreasonable restrictions.  The Chief may:

(A) Limit the hours during which the firearm may be carried unconcealed;

(B) Limit the locations where the firearm may be carried unconcealed;

(C) Limit the purpose for which the firearm may be carried unconcealed.

(D) Limit the number of rounds of ammunition that may be carried; or

(E) Impose any other reasonable conditions.

The licensee shall appear at the Firearms Unit in person to be photographed, after which the License shall be issued.

(g ) If an application for a License is denied, the denial letter shall set forth the facts of the application and explain the reasons for the denial based on Sections 134-7 or 134-9, Hawaii

Revised Statutes, the standards and factors described in these rules, or any other source of applicable law.

§15-26. License card; expiration; renewal; lost or stolen cards. (a) If the application for License to Carry Firearm is granted, Honolulu Police Department personnel shall issue the licensee a card that includes the licensee's name, photograph, make and caliber of the firearm, firearm serial number, and expiration date.

(b) The card shall also contain a warning that the licensee is responsible for understanding and complying with the laws of the State of Hawaii and the laws regarding the use of deadly force in self-defense.

(c) The licensee shall have the card in the licensee's possession when carrying the firearm in public.

(d) Unless renewed, every License shall expire, and become invalid, one year from the date of issue.

(e) A License may be renewed once upon submission of the following:

(1) The completed Honolulu Police Department Application for License to Carry Concealed Firearm or License to Carry Unconcealed Firearm;

(2) An affidavit as provided in section 15-20(a)(8), attesting that the applicant has satisfied the shooting proficiency test set forth in section 15-19(d)(3) within the 90 days preceding the date of submission of the renewal application for each firearm for which a license is sought;

(3) One United States passport-sized, front-facing photo of the applicant;

(4) A non-refundable fee of $10.00, or, if higher, the maximum amount permitted by state law for the License and any background check or other processing fees; and

(5) Any other forms required by state or federal law.

The licensee shall submit the materials no earlier than 90 days, and no later than 30 days, prior to the expiration of the License.

(f) To renew any License that has already been renewed once pursuant to subsection (e), a licensee shall complete all requirements for the License as set forth in section 15-20(a) and shall submit the materials no earlier than 90 days, and no later than 30 days, prior to the expiration of the License. If the License is renewed after submission of a complete application pursuant to this subsection, the licensee shall be entitled to renew the License pursuant to subsection (e). if the licensee continues to meet all requirements, the License shall be renewed for one year after the expiration of the licensee's existing License.

(g) After receiving notice that the renewal application has been approved, and no earlier that 30 days before expiration of the existing License, the licensee shall take possession of the new card. The new license shall be effective upon issuance.

(h) The licensee may submit materials fewer than 30 days before expiration of the licensee's existing License however, this may result in a gap in licensure, as the licensee's License shall expire one year from the date of issue regardless of the existence of a pending application.

(i) If the licensee's License is renewed, the licensee shall be issued a new card.

(j) Licensees shall report a lost or stolen card to the Honolulu Police Department within 24 hours of the loss or theft. The licensee shall appear in person at the Honolulu Police Department and request issuance of a replacement card. A replacement card shall only be valid for the remaining term of the existing License. The license shall be charged a non-refundable fee of $10.00, or, if higher, the maximum amount permitted by state law to issue a new card.

(k) Licenses cannot be transferred to any other person, and a License shall be surrendered to the Firearm Unit if the firearm is sold or transferred prior to the expiration of the License.

(l) Licenses cannot bs used to carry any other firearm other than the firearm for which a License is granted.  A licensee shall submit a new application if the licensee wishes to carry a non-licensed firearm.

§15-27.  Revocation.  (a) Revocation of License.

(1) The following will immediately result in revocation of all of a licensee's Concealed Licenses:

(A) Conviction of the licensee for any criminal offense.
(B) Any event or circumstance that, by law, requires the licensee to surrender any firearms.
(C) Where a licensee who does not possess an Unconcealed License has been found carrying a firearm that is not concealed.
(D) Where the licensee has been found carrying a firearm other than a firearm for which the licensee holds a License.
(E) Where the licensee has been carrying more than one firearm at a time, regardless of whether the licensee holds Licenses for the firearms.
(F) Where the licensee has been suspected or convicted of the illegal use or abuse of drugs or alcohol, or where the licensee has been found carrying a firearm in public while under the influence of drugs or alcohol.
(G) A physical or psychological impairment that, for the remaining term of the present License, prevents the licensee from safely carrying a firearm in public.
(H) Where the licensee has been found carrying a firearm while on-duty and engaged in the business of being a Detective, Private Detective, Investigator, or Guard without a License issued pursuant to section 15-21.
(I) Where the License was based upon the licensee's employment, and the licensee has been separated from such employment.
(J) If applicable, where the licensee's license to serve as Detective, private Detective, Investigator, or Guard pursuant to Sections 463-5, and 463-7, Hawaii Revised Statutes, has been revoked.

(K) Where the Chief of Police has specific and articulable information that the licensee no longer meets the objective criteria set forth in Sections 134-7 and 134-9, Hawaii Revised Statutes, and these rules.

(2) The following will immediately result in revocation of a License to Carry Unconcealed Firearm:

(A) Any circumstance in which a Concealed License would be revoked, except that the licensee marry a firearm that is not concealed.

(B) Where the Chief of Police, in the Chief's discretion, determines that the licensee no longer meets the requirements of Section 134-9, Hawaii Revised Statutes, or section 15-24.

(3) The revocation of the License shall be for the remaining term of the present License or until reinstated by the Chief.

(4) If a License is revoked, the licensee shall surrender the License to any Honolulu Police Department officer within 24 hours.

(5) A licensee whose concealed License is revoked shall be ineligible to apply for another License, concealed or unconcealed, for one year following the date of revocation.

(6) A licensee whose Unconcealed License is revoked shall be ineligible to apply for another License, concealed or unconcealed, for one year following the date of revocation, if the revocation occurred pursuant to subsection (2)(A).

(b) Revocation of Instructor Verification.

(1) The following will immediately result in revocation of an instructor's verification to administer a firearm certification program:

(A) Any event or circumstance that, by law, requires the instructor to surrender any firearms.

(B) Any event or circumstance that would make the instructor ineligible to receive verification pursuant to section 15-19(e)(3).

54

(C) If the instructor possesses and Licenses, revocation of any License.

(2) The revocation of the verification shall be for the remaining term of the present verification or until reinstated by the Chief.

(3) An instructor whose verification is revoked shall be ineligible to apply for another verification for one year following the date or revocation.

§15-28 Appeal procedures. (a) If an applicant for a License or instructor verification objects to a denial or revocation of a License or instructor verification, the applicant may request a hearing.  A Detective Agency or Guard Agency may request a hearing on behalf of its employees.

(b) Hearings shall be held in accordance with Rule 7, provided that the applicant shall request the hearing in writing no later than 45 days after the date of the decision letter.  The request shall be deemed untimely, and no action will be taken thereon, unless the request is received by the Honolulu Police Department no later than the close of business on the 45th day after the date of the decision letter. In the event the 45th day falls on a weekend or holiday, the deadline shall be the close of business on the previous business day.

(c) The hearing shall constitute a contested case hearing for purposes of HRS §91-14 and the applicant or Agency shall be entitled to judicial review under that section.

V

## CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMENDMENTS II AND XIV RIGHT TO BEAR ARMS 42 U.S.C. §1983

44.  Plaintiffs hereby re-allege and incorporate by reference the allegations in the forgoing paragraphs as if set forth fully herein;

45.  Plaintiffs do not concede that any Hawaii Revised Statute or County code or policy, practice, habit, custom, or rule is constitutional;

46.  Plaintiffs allege that County's delay in the issuance of their CCW licenses has violated their Second and Fourteenth Amendment U.S. Constitutional rights;

47.  Following the *Bruen* decision, Hawaii, and County, erected onerous laws, customs, policies and practices that are designed to delay, deprive and infringe upon the exercise of Second Amendment rights for as long as possible;

48.  In numerous contexts, the Constitution forecloses conditioning the exercise of rights on lengthy waiting periods. *See, e.g.*, *Rogers v. Hacker*, 2023 WL 5529812, at *8 (S.D. Ill. Aug. 28, 2023) (finding a waiting period of *five months* to issue a firearm owners ID card constituted a concrete injury); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 263-64 (1974) (an Arizona statute imposing a *one-year waiting period* for new residents to become eligible for state medical assistance impermissibly interfered with the constitutional right to freedom of interstate immigration). In *Cooper v. Aaron,* 358 U.S. 1 (1958), the Supreme Court was confronted

with similar bureaucratic foot dragging in implementing public school

integration. Given the open defiance of the Supreme Court's opinion in

*Brown I*[6] and *Brown II*,[7] the Court did not tolerate finger-pointing, simply

observing that "delay in any guise in order to deny . . . constitutional rights .

. . could not be countenanced, and that only a prompt start, diligently and

earnestly pursued . . . could constitute good faith compliance." 358 U.S. at 7.

49. There is no Hawaii Revised Statute, County ordinance or County

custom, policy, rule, law or practice to issue CCW, the exercise of a

fundamental constitutional right protected by the Second Amendment, as

expeditiously as possible.  To the contrary, County has unfettered discretion

to drag its feet[8];

50.  County's unfettered discretion and its application of that unfettered

discretion is arbitrary and thus ultra vires;

---

[6] *Brown v. Board of Education*, 347 U.S. 483 (1954).
[7] *Brown v. Board of Education,* 349 U.S. 294 (1955).
[8] And although County's rules ostensibly state that the burden to disapprove an application falls upon the Chief, *see* Rule 15-23(1) and (2), if County merely shelves applications the applications are then effectively denied.  Thus, the applicant starts off without a CCW and remains that way and County can just allow applications to languish to continue to deprive and infringe upon applicant's applications.  Since the burden is on County to disallow the CCW, then the CCW should issue unless County specifically disallows the application, and in a ministerial and almost instantaneous manner.

51.  Plaintiffs do not concede that any delay in the issuance of a CCW license is permissible[9].  In fact, to the extent that any sort of CCW is required[10], it is possible to issue CCW licenses nearly instantaneously.   For example, Cumberland County, Pennsylvania issues Pennsylvania Licenses to Carry Firearms almost *instantaneously*, even with a required background check. *See* License to Carry Firearms, Cumberland Cnty., Pa. https://www.cumberlandcountypa.gov/3094/License-to-Carry-Firearms (last visited Jan. 31, 2024), Applicants can choose to either apply online, or on paper in person, where they wait on the premises until the background check clears and the permit is printed. Many state sheriffs across the country operate similarly—walk in, complete a background check, and walk out a few minutes later with a permit.

### Plaintiff Benjamin Nelson

---

[9] Plaintiffs allege that if unconcealed carry licenses are subject to governmental hurdles and discretion and licensure, then concealed carry cannot be.  Hawaii can choose to allow one mode of carry to have some level of governmental hurdles and discretion and the other to not have those hurdles, but they cannot make both modes of carry onerous, expensive, discretionary, and here, complete with interminable delays.

[10] Arizona is but one of 27 states that is "constitutional carry" or carry without a permit or license.  In Arizona you can carry openly or concealed without a permit.

52.  Plaintiff Benjamin Nelson realleges and incorporates by reference all of the foregoing allegations of this complaint;

53.  Plaintiff Benjamin Nelson challenges County's custom, policy, rule, or practice of delay in the issuance of his CCW license;

54.  Plaintiff Nelson challenges County's custom, policy, rule or practice of unfettered and arbitrary discretion in the issuance of his CCW license;

55.  Plaintiff Nelson challenges County's custom, policy, rule or practice of ultra vires actions, including delay, in the issuance of his CCW license;

56.  Plaintiff Nelson is a U.S. citizen, a male, and a resident of Honolulu County;

57.  Plaintiff Nelson legally owns two pistols;

58.  Plaintiff Nelson is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm, including in a concealed manner;

59.  Plaintiff Nelson has completed all requirements under Hawaii law and County regulation to be issued a CCW license;

60.  Plaintiff Nelson applied for a CCW by submitting all necessary paperwork to County on or about March 15, 2023;

61.  Plaintiff Nelson has not received an approval or a denial or any written communication from County regarding his CCW application since March 2023;

## Plaintiff Corey Kahalewai

62.  Plaintiff Corey Kahalewai realleges and incorporates by reference all of the foregoing allegations of this complaint;

63.  Plaintiff Kahalewai challenges County's custom, policy, rule, or practice of delay in the issuance of his CCW license;

64.  Plaintiff Kahalewai challenges County's custom, policy, rule, or practice of unfettered and arbitrary discretion in the issuance of his CCW license;

65.  Plaintiff Kahalewai challenges County's custom, policy, rule or practice of ultra vires actions, including delay, in the issuance of his CCW license;

66.  Plaintiff Kahalewai is an adult male, U.S. citizen and resident of Honolulu county;

67.  Plaintiff Kahalewai legally owns a firearm;

68.     Plaintiff Kahalewai is not disqualified under Hawaii or federal law

from owning, possessing or carrying a firearm. Including in a concealed

manner;

69.     Plaintiff Kahalewai has completed all requirements under Hawaii law

and County regulation to be issued a CCW license;

70.     Plaintiff Kahalewai applied for a CCW in or about the month of May

2023 and submitted all necessary documentation;

71.     Plaintiff Kahalewai was in contact with County in or about the month

of September 2023 and was informed that a portion of his CCW application

had been misplaced or lost.  Plaintiff Kahalewai replaced the missing

documentation at County's request and submitted a second CCW application

in or around September 2023.  Plaintiff Kahalewai was emailed on or about

October 6, 2023 and was informed that his application was being processed.

72.      Plaintiff Kahalewai has not received an approval or a denial or any

written communication from County regarding his CCW application since

October 2023;

**Plaintiff Kirk Kama**

73. Plaintiff Kirk Kama realleges and incorporates by reference all of the

foregoing allegations of this complaint;

74. Plaintiff Kama challenges County's custom, policy, rule, or practice of delay in the issuance of his CCW license;

75. Plaintiff Kama challenges County's custom, policy, rule, or practice of unfettered and arbitrary discretion in the issuance of his CCW license;

76. Plaintiff Kama challenges County's custom, policy, rule or practice of ultra vires actions, including delay, in the issuance of his CCW license;

77. Plaintiff Kama is an adult male, U.S. citizen and resident of the state of Hawaii;

78. Plaintiff Kama legally owns a firearm;

79. Plaintiff Kama is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm, including in a concealed manner;

80. Plaintiff Kama has completed all requirements under Hawaii law and County regulation to be issued a CCW license;

81. Plaintiff Kama applied for a CCW in or about the month of March 2023 and submitted all necessary documentation;

82. Plaintiff Kama has not received an approval or a denial or any written communication from County regarding his CCW application since March 2023;

**Plaintiff HIFICO**

83.  Plaintiff HIFICO realleges and incorporates by reference all of

the foregoing allegations of this complaint;

84.  Plaintiff HIFICO, on behalf of all HIFICO members with pending CCW applications with County that have not been decided for at least one-hundred-twenty (120) days after submission, challenges County's custom, policy, rule, or practice of delay in the issuance of CCW licenses;

85.  Plaintiff HIFICO, on behalf of all HIFICO members with pending CCW applications with County that have not been decided for at least one-hundred-twenty (120) days after submission, challenges County's custom, policy, rule or practice of unfettered and arbitrary discretion in the issuance of CCW licenses;

86.     Plaintiff HIFICO, on behalf of all HIFICO members with pending CCW applications with County that have not been decided for at least one-hundred-twenty (120) days after submission, challenges County's custom, policy, rule or practice of ultra vires actions, including delay, in the issuance of  CCW licenses;

87.     Plaintiff HIFICO has members that are either United States Citizens or legal permanent residents, who are not disqualified under federal or state law from the acquisition, possession, ownership or carriage of firearms, who

have completed all requirements necessary to have a CCW license issued

pursuant to state law and County rules, and have submitted an application

for CCW licensure and have not received an approval or denial within or up

to one-hundred-twenty (120) days after submission of the CCW application;

## VI

## CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMEND XIV PROCEDURAL DUE PROCESS

88.  Plaintiffs repeat and reallege the allegations of the preceding

paragraphs as if set forth herein;

89.  County has not gotten the United States Supreme Court's message from

*Bruen.*  Prior to *Bruen*, County had treated, for more than a century, the

Second Amendment as dead, buried and forgotten having almost never

issued any concealed carry permits[11].  Once *Bruen* was decided and county

police chiefs began to issue a trickle of concealed carry permits, under new

county specific onerous carry concealed permit regulations, County acted to

ensure that even if people managed to overcome the burdensome

requirements to actually obtain a concealed carry permit, the permits would

be issued so slowly and rarely as to be rendered utterly useless.  County

merely switched gears from almost never issuing any concealed carry

---

[11] And apart from armored car drivers, no open carry permits.

permits so that there was no one with a permit, to issuing permits so slowly that it has essentially kept the permitting system the same as it was prior to *Bruen*- completely discretionary.   Notwithstanding the United States Constitution and the Second Amendment and the *Bruen* decision, County just simply does not want anyone to be able to carry a firearm anywhere within the state, - which is their fundamental, ancient, constitutionally protected and guaranteed right[12].

90.  For purposes of all Counts and Claims the Defendant has acted under "color of state law" within the meaning of Section 1983.

91.  All Plaintiffs have a right to procedural due process which means that constitutional rights cannot be delayed;

92.  Plaintiffs do not concede that any permit is required to carry an arm, openly or concealed under the U.S. Constitution;

93.  To the extent that a permit or license is needed to carry an arm openly or concealed, at present, the issuance of such a license or permit, CCW, cannot be delayed;

94.  Plaintiffs do not concede that the issuance of a CCW within one-

---

[12] County has essentially limited unconcealed carry to guards and private detectives.  So here County has focused its efforts to destroy the only way the common man can carry in County, concealed.  To that end County just shelves applications effectively continuing to deny Plaintiffs and other applicants their Second Amendment rights.

hundred-twenty (120) days after submission is constitutional;

95.  For purposes of this Complaint only, the new State requirement, effective January 1, 2024, that CCW be issued within one-hundred-twenty (120) days after submission, *see* H.R.S. § 134-9(j), can be used as a benchmark and proof that County is deliberately dragging its feet and refusing to comply with the mandate of *Bruen*;

96.  County, by dragging its feet in the issuance of CCW for Plaintiffs, and others, has flipped *Bruen* on its head.  Instead of placing some minimal limitation on unconcealed carry and being a true "shall issue" jurisdiction with regard to concealed carry, County has ensured that applications, for concealed carry, CCW, will just be shelved thereby placing the burden of an "appeal" on all applicants whose applications just sit interminably when County doesn't issue any approval or denial at all;

## VII

## CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMEND. XIV SUBSTANTIVE DUE PROCESS

97.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein;

98.     When a Defendant, such as County, acts in an ultra vires manner, it acts arbitrarily and or unreasonably;

99.     County, by delaying the exercise of a fundamental constitutional right, to wit, the Second Amendment right to bear arms, through the issuance of a CCW, has acted in an ultra vires manner;

100.    County, by delaying the exercise of a fundamental constitutional right, to wit, the Second Amendment right to bear arms, through the issuance of a CCW, has acted in an arbitrary and or unreasonable manner;

101.    When government, such as County, has acted in an arbitrary, unreasonable and or an ultra vires manner, to include by delaying the exercise of a fundamental constitutional right, it has violated Plaintiffs' substantive due process rights.  "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Foucha v. Louisiana,* 504 U.S. 71, 78 (1992). Ultra vires conduct is inherently arbitrary. *Cine SK8, Inc. v. Town of Henrietta* 507 F.3d 778, 790 (2d Cir. 2007).  County's conduct is ultra vires because it has instituted unreasonable delays;

102.    Plaintiffs have a liberty interest and a fundamental right interest in exercising their Second Amendment rights to bear arms, including in a concealed manner, with or without a CCW.

# VIII

## (DECLARATORY JUDGMENT)

103.   Plaintiffs repeat and reallege the allegations of the preceding

paragraphs as if set forth herein;

104.   The Declaratory Judgment Act provides: "In a case of actual

controversy within its jurisdiction, any court of the United States may

declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be

sought." 28 U.S.C. 2201(a);

105.   Absent a declaratory judgment, there is a substantial likelihood that

Plaintiffs will suffer irreparable injury in the future;

106.   There is an actual controversy between the parties of sufficient

immediacy and reality to warrant issuance of a declaratory judgment;

107.   This Court possesses an independent basis for jurisdiction over the

parties;

108.   Plaintiffs seek a judgment declaring that Defendant's customs,

policies, rules and or practices, to wit, delay in the issuance of CCW,

which deny Plaintiffs their Second Amendment rights to carry arms in

case of confrontation with a CCW, are unconstitutional under the Second Amendment;

109.   Alternatively, a declaration that County's customs, policies, rules and or practices are unconstitutional as applied to each Plaintiff;

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1.   An order preliminarily and permanently enjoining Defendant, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Defendant's policies, rules, customs, or practices complained about above;

2.   Declaratory relief that the complained of County customs, policies, rules and or practices are unconstitutional;

3.   An order compelling County to process Plaintiffs' applications immediately;

4.   An order compelling County to process all applications within one-hundred-twenty (120) days;

5.   Awarding Plaintiffs' attorney fees and costs pursuant to 42 U.S.C. §1988;

6.   Nominal Damages.

7.   Compensatory Damages

8.   Such other relief consistent with the injunction as appropriate; and

9.   Such other further relief as the Court deems just and appropriate.

Dated: March 1, 2024.

Respectfully submitted,

/s/ *Kevin O'Grady*

Kevin Gerard O'Grady

Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

/s/ *Alan Beck*

Alan Alexander Beck

Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com
Counsel for Plaintiffs

## VERIFICATION

I, Benjamin Nelson, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on February 28, 2024

BENJAMIN NELSON

## VERIFICATION

I, Corey Kahalawai, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on February 28, 2024

COREY KAHALAWAI

72

## VERIFICATION

I, Kirk Kama, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.


Executed on February 28, 2024

KIRK KAMA

73

## VERIFICATION

I, Andrew Namiki Roberts, as Director of Hawaii Firearms Coalition, and on behalf of HIFICO members statewide, declare as follows:

1. I am the Director of the Hawaii Firearms Coalition as an institutional Plaintiff in the present case and a nonresident alien.

2 . I have personal knowledge of myself, my activities, and my intentions, as well as the activities of HIFICO and its members, including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions, and the activities of HIFICO and its members are true and correct.

Executed on February 28, 2024

ANDREW NAMIKI ROBERTS